**In re Lucy Young JOHNSON, Debtor.**

**No. BKY 03–31044.**

United States Bankruptcy Court,
D. Minnesota.

Oct. 10, 2003.

Juan J. Martinez, Alan W. Weinblatt, St. Paul, MN, for debtor.

Michael J. Iannacone, Lake Elmo, MN, trustee.

## ORDER SUSTAINING TRUSTEE'S OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION

GREGORY F. KISHEL, Chief Judge.

This Chapter 7 case came on before the Court for hearing on the Trustee's objection to the Debtor's claim of exemption in certain funds in an account. Trustee Michael J. Iannacone appeared as objector and counsel to the bankruptcy estate. The Debtor appeared by her attorneys, Juan J. Martinez and Alan W. Weinblatt. After post-hearing augmentation of the record, the Court took the matter under advisement. On the record thus made, the Court memorializes the following decision.

### PROCEEDING AT BAR

The Debtor filed a voluntary petition under Chapter 7 on February 14, 2003. At item 33 of her Schedule B, she noted an interest in personal property described as "Proceeds of workers compensation settlement (Oppenheimer Funds)." She stated the value of this asset as $26,400.00. In her Schedule C, the Debtor elected the exemptions available to her under Minnesota state law, and claimed the full stated value of this asset as exempt under Minn. Stat. § 176.175.

The Trustee timely objected to this claim of exemption. As grounds, he stated that Minn.Stat. § 176.175, Subd. 2, identifies a "claim for compensation owned by an injured employee or dependent" as the asset subject to its exemption. This, he maintained, "does not include actual proceeds of a workers compensation settlement." The Debtor responded to the objection. This is the matter at bar.

### FINDINGS OF FACT

1. In 1992–1993, the Debtor sustained injuries to her back and neck during the course of her employment as a licensed practical nurse.

2. The Debtor filed a claim against United Hospital, her employer, with the Workers' Compensation Division of the Minnesota Department of Labor and Industry. In May, 1994, she and United

Hospital settled her claim. The settlement provided for a lump-sum payment to the Debtor in the amount of $32,000.00, in lieu of periodic payments for temporary and permanent partial disability.

3. After a deduction of allowed attorney fees, the Debtor received that lump-sum payment in the form of a check in the amount of $25,400.00.

4. The Debtor invested these proceeds of settlement through a brokerage into a vehicle described as "Oppenheimer Funds." She did so to provide an income supplement for herself and her family; she recognized that her permanent injuries would prevent her from returning to her long-term nursing employment in a hospital setting and would permanently decrease her employability.

5. The Debtor kept the Oppenheimer Funds account through the date of her bankruptcy filing, nearly nine years after receiving the settlement payment. As of the date of her bankruptcy filing, the value of the account was $24,913.79.

6. The Debtor was not employed as of the date of her bankruptcy filing. In the Statement of Financial Affairs for this case, she recited that she had had income of $80,000.00 in 2002 and $120,000.00 in 2001.

## DISCUSSION

The Minnesota's Workers' Compensation Act provides, in pertinent part:

> Nonassignability. No claim for compensation or settlement of a claim for compensation owned by an injured employee or dependents is assignable. Except as otherwise provided in this chapter, any claim for compensation owned by an injured employee or dependents is exempt from seizure or sale for the payment of any debt or liability.

Minn.Stat. § 176.175, Subd. 2.

In objecting to the Debtor's claim of exemption in the monies in her Oppenheimer Funds account, the Trustee relies on the facial content of this statute. He invokes the "plain meaning" approach to statutory construction favored by the United States Supreme Court in much of its recent bankruptcy jurisprudence.[1] The Trustee argues that the exemption is limited to unfixed, unliquidated claims for workers' compensation benefits. As he would have it, once an employee realizes on a claim after settlement or determination, the funds she receives in-hand are no longer an intangible "claim"; rather, they are liquid cash or a cash equivalent that is outside the protection of the statute.

1. *E.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000); *Rake v. Wade,* 508 U.S. 464, 472–473, 113 S.Ct. 2187, 2192–2193, 124 L.Ed.2d 424 (1993); *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380, 387, 113 S.Ct. 1489, 1494, 123 L.Ed.2d 74 (1993); *Patterson v. Shumate,* 504 U.S. 753, 758, 112 S.Ct. 2242, 2246–2247, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz,* 503 U.S. 638, 642, 112 S.Ct. 1644, 1647–1648, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson,* 503 U.S. 393, 395–400, 112 S.Ct. 1386, 1388–1391, 118 L.Ed.2d 39 (1992); *U.S. v. Nordic Village, Inc.,* 503 U.S. 30, 32–37, 112 S.Ct. 1011, 1014–1016, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas,* 502 U.S. 151, 160–162, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991); *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.,* 502 U.S. 32, 38, 112 S.Ct. 459, 463, 116 L.Ed.2d 358 (1991); *Toibb v. Radloff,* 501 U.S. 157, 160–161, 111 S.Ct. 2197, 2199–2200, 115 L.Ed.2d 145 (1991); *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 101–102, 109 S.Ct. 2818, 2822–2823, 106 L.Ed.2d 76 (1989) (plurality opinion); *United States v. Ron Pair Ents., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Contra, BFP v. Resolution Trust Corp.,* 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994); *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

The Debtor's response to the objection made it more complicated than that. The Debtor relies on *Gagne v. Christians*, 172 B.R. 50 (D.Minn.1994).

*Gagne* arose out of two different bankruptcy cases. In both of them, the debtors had settled claims for workers' compensation benefits and had received lump-sum payments pursuant to the settlements before they filed for bankruptcy. The trustee in both cases objected to the debtors' claims of exemptions to the proceeds. Both debtors had claimed their exemptions under Minn.Stat. § 176.175, Subd. 2. The bankruptcy court sustained the trustee's objections in both cases. *In re Gagne*, 163 B.R. 819 (Bankr.D.Minn.1994). On appeal, the District Court held that the language of Minn.Stat. § 176.175 that was on the books in 1994 provided an exemption for the proceeds in the forms in which the debtors held them when they filed for bankruptcy. Since the issuance of the District Court's *Gagne* decision, no court has published a decision construing Minn.Stat. § 176.175, Subd. 2, on the same facts.

As a result of the Debtor's reliance on *Gagne*, the parties to this case framed three issues.

*1. Whether the District Court's rationale in* Gagne *is precedent that is binding on the Bankruptcy Judges for this District.*

■ *Stare decisis* is the principle of Anglo–American judicature that dictates adherence to the prior decisions of higher courts. 5 AM. JUR.2d *Appellate Review* § 599 (1965) ("Under the doctrine of *stare decisis*, once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised..."). *See also In re Osborne*, 76 F.3d 306, 309 (9th Cir.1996); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Internat'l*, 373 F.2d 136, 140 (8th Cir.1967);

*Percy v. Hofius*, 370 N.W.2d 490, 491 (Minn.Ct.App.1985). The Debtor's counsel insists that the doctrine of *stare decisis* compels this Court to follow *Gagne* and to overrule the Trustee's objection.

The issue here is whether the ruling of one district judge sitting pursuant to 28 U.S.C. § 158(a) on an appeal from a bankruptcy judge's decision is binding thereafter on all of the bankruptcy judges of the same district. It is a difficult one. The text of the statute, 28 U.S.C. § 158, is utterly silent on the issue. The Eighth Circuit Court of Appeals has not spoken to the issue. As the Eleventh Circuit observed several years ago, neither the United States Supreme Court nor any of the Courts of Appeal have ruled on the issue. *In re Hillsborough Holdings Corp.*, 127 F.3d, 1398, 1403 n. 3 (11th Cir.1997).

The published case law is of limited utility; there is quite a split on the question among the courts below the circuit level. *Id.* At least one judge of a district court has ruled on each side of the issue. *In re KAR Dev. Assocs., LP*, 180 B.R. 629, 640 (D.Kan.1995) (holding that bankruptcy judges are not bound by appellate rulings of single district judges, even those from their own district); *Bryant v. Smith*, 165 B.R. 176, 180–181 (W.D.Va.1994) (bankruptcy judges are bound by decisions rendered by the district court in bankruptcy appeals).

Predictably, there is a greater number of published decisions by bankruptcy judges, and again the authors weigh in on both sides of the issue. Compare *In re Login Bros., Book Co., Inc.*, 294 B.R. 297, 300 n. 1 (Bankr.N.D.Ill.2003), *In re NHB, LLC*, 287 B.R. 475, 479 and n. 3 (Bankr. E.D.Mo.2002), *In re Virden*, 279 B.R. 401, 409 n. 12 (Bankr.D.Mass.2002), *In re Carrozzella & Richardson*, 255 B.R. 267, 271–273 (Bankr.D.Conn.2000), *Bairstow v. Sullivan*, 198 B.R. 417, 423 n. 34 (Bankr.

D.Mass.1996), *In re Barakat,* 173 B.R. 672, 678 (Bankr.C.D.Cal.1994), and *In re Gaylor,* 123 B.R. 236, 241–243 (Bankr. E.D.Mich.1991) (all holding that appellate decisions of single district judges in multiple-judge districts are not binding on bankruptcy judges for the district) *with, e.g., In re Phipps,* 217 B.R. 427, 430–431 (Bankr.W.D.N.Y.1998), *In re Holdenried,* 178 B.R. 782, 786 (Bankr.E.D.Mo.1995), and *In re Jehan–Das, Inc.,* 91 B.R. 542, 546 (Bankr.W.D.Mo.1988) (all holding that bankruptcy judges are bound by rulings of district judges from their own district). In the reported decisions, a small majority of bankruptcy judges seems to favor the option of not according precedential effect. However, that statistical happenstance has no meaning... particularly when one considers the placement of those making the pronouncement against the nature of the question.

Structural circumstances support the argument against precedentiality.

■ In the first instance, district judges—like bankruptcy judges—sit as coequals in a court that presides over litigation on the trial level. *See* 28 U.S.C. § 132(c). Each judge is responsible for her or his own docket, and each has full judicial independence under the Constitution, statute, and custom. Absent binding precedent, district judges are free to decide legal issues as the application of logic, the general principles of the common law, the rules of statutory construction, persuasive authority, public policy, and their own sense of right and wrong will suggest.

These considerations achieve their proportions under the guidance of reason and balance—but this is done by individuals, rather than by a collective.[2] Consistent with these structural and functional characteristics, there is no provision in statute or rule that binds one district judge to a prior ruling made by a colleague in a different case. There is, in fact, opinion to the contrary from one of this district's district judges: *Mueller v. Allen,* 514 F.Supp. 998, 1001 (D.Minn.1981), *aff'd,* 676 F.2d 1195 (8th Cir.1982), *aff'd,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). *See also U.S. v. Anaya,* 509 F.Supp. at 293 n. 2.

■ To opposite effect, however, *stare decisis* contemplates the future binding of courts both at the same and at lower levels. *See* 5 Am. Jur.2d *Appellate Review* § 599, quoted *supra* at p. 474; *In re Osborne,* 76 F.3d at 309; *Care Institute, Inc.–Maplewood v. County of Ramsey,* 576 N.W.2d 734, 737 (Minn.1998). The free latitude in decision-making enjoyed by single district judges is not consistent with the making of precedent on a horizontal or a vertical basis. *In re Barakat,* 173 B.R. at 678; *In re Gaylor,* 123 B.R. at 242–243.

■ Notwithstanding all this, a bankruptcy judge should be inclined to defer to well-reasoned pronouncements by a district judge in the same district. There are several reasons for doing so. Not the least is that this deference would ease and expedite the process of an appeal to the circuit level, where a collegial body would

---

**2.** There are options for a collegial, multi-judge process of decision-making in the district court, but they are very limited. One is the "district court of three judges" under 28 U.S.C. § 2284, which hears disputes over the constitutionality of legislative reapportionment. Another may be an inherent power to come together *en banc* to pass on important issues of district-wide application, particular-

ly on matters of procedure or to ensure a uniformity of result on an issue common to multiple pending proceedings. *See U.S. v. Anaya,* 509 F.Supp. 289, 293–294 (S.D.Fla. 1980), *aff'd,* 685 F.2d 1272 (11th Cir.1982). Sitting in numbers in the district court ultimately is a rare event indeed, and one that does not readily match to the function of a trial court in the Anglo–American system.

render unquestionably binding precedent on substantive issues that were thorny enough to breed strong opposing arguments in the first place.

As a lengthy, thoughtful, citation-supported, and carefully-worded decision by a district judge, *Gagne* ordinarily should receive such deference. However, in the nine years since its rendering, there have been intervening developments in the courts' interpretation of another Minnesota exemption statute. The relevant attributes of the asset at issue in those decisions are very close to the one involved in *Gagne* and here. The function of the two statutes in context is nearly identical. The corollary in subject matter and statutory governance is so strong that it is not just appropriate to consider the applicability of these decision's reasonings to the dispute at bar; it is virtually mandated. Thus, any consideration of deference to *Gagne* should be delayed until after it is determined whether this intervening authority has superseded *Gagne*'s rationale.

### 2. Whether post-Gagne rulings have undercut its rationale.

As noted, *Gagne* is the only recent published judicial interpretation of Minn.Stat. § 176.175, Subd. 2, and the only one that is on point with the case at bar.[3] Since *Gagne* was rendered, however, two appellate courts have interpreted the language of Minn.Stat. § 550.37, Subd. 22, a statute that treats very similar subject matter. One of them applied it to an asset identical to the one at bar. The language construed by these courts provides that the following property is "not liable to attachment, garnishment, or sale on any final process, issued by any court":

Rights of Action. Rights of action for injuries to the person of the debtor or of

a relative whether or not resulting in death.

In *Christians v. Dulas*, 95 F.3d 703 (8th Cir.1996), the court held that an annuity policy purchased with the proceeds of the settlement of a personal injury action arising out of an automobile accident was not a "right of action" within the meaning of Subd. 22. 95 F.3d at 704. "The statute exempts rights of action, not rights of payment." *Id.* (citing *In re Medill*, 119 B.R. 685, 687 n. 3 (Bankr.D.Minn.1990)). In *Dulas*, "[by] settling their claim, the debtors reduced their right of action to a right of payment"; this prevented the resultant cash proceeds and the annuity into which they were invested from qualifying for the exemption under Subd. 22. 95 F.3d at 704, 705. Because Minnesota's exemption scheme lacks a provision for the cash proceeds of the settlement of a claim for personal injury received by a debtor and then held in any form, such an asset is not protected from the claims of creditors, or from a trustee in bankruptcy. 95 F.3d at 705.

In a recent unpublished opinion, the Minnesota Court of Appeals used state-law authority for the "plain meaning" approach to statutory construction, to hold that

> ...subd. 22, exempts from execution a debtor's right of action, but does not exempt from execution proceeds obtained from a personal-injury action.

*Sunde v. Fobair Furniture, Inc.*, 2000 WL 1051938, *2 (Minn.Ct.App.2000). The *Sunde* court noted that "the federal courts have applied the statute consistent with [this] interpretation..." *Id.* (citing *Christians v. Dulas* and *In re Procter*, 186 B.R. 466 (Bankr.D.Minn.1995)). Thus, it held, a lump-sum payment made in settlement of

---

**3.** Two earlier decisions, *Knoble v. Storer Realty Co.*, 255 N.W.2d 388 (Minn.1977) and *Senske v. Fairmont & Waseca Canning Co.*, 232 Minn. 350, 45 N.W.2d 640 (1951), are not on all fours with the present case's facts or legal issues.

a personal injury action, deposited with a court administrator for the benefit of the plaintiff-debtor, was subject to execution by a third-party creditor, because the funds were not exempt under Subd. 22. *Id.*

Minn.Stat. §§ 176.175, Subd. 2 and 550.37, Subd. 22, use different words to identify their subjects—"claim" as opposed to "right of action." However, the denoted assets have the same essence: an unfixed, unliquidated right of recovery against a party that might be held liable to compensate the debtor under applicable law. This identical understanding is consistent with the sense of the statutes' words under general principles of American law. "Claim" is defined as "[a] cause of action," or a "[d]emand for money or property as of right ..." BLACK'S LAW DICTIONARY 247 (6th ed.1998). In turn, "cause of action" is defined, *inter alia,* as a "[m]atter for which action may be maintained," or "[t]he fact or facts which give a person a right to judicial redress or relief against another." *Id.* at 221. Finally, "right of action" is defined as "[t]he right to bring suit; a legal right to maintain an action, growing out of a given transaction or state of facts and based thereon," or "[a] right presently to enforce a cause of action by suit." *Id.* at 1325. There may be a fine nuance between "claim" on the one hand and "right of action" on the other, the nature of the former perhaps focused more on the factual dimension and that of the latter more on the legal or procedural. Nonetheless, as a matter of semantics, the underlying concepts are indistinguishable.

The coincident meaning of statutory identifiers is enough to establish *Dulas* and *Sunde* as corollary authority for the dispute at bar. To even stronger effect, however, the functional attributes of the statutes' subjects are virtually identical. The Eighth Circuit clearly recognized that

a tortfeasor's performance on the settlement of a personal injury claim creates an asset for the claimant that is distinct from the one identified in Subd. 22. There is no longer an undifferentiated, intangible right to maintain a suit or an administrative proceeding, definable more by the operative facts of its arising than by anything else. There is instead a figurative pot of value, cash in-hand or on deposit, fixed in amount, and liquid or potentially so. The asset or attribute identified in the exemption statute is extinguished upon the claimant's receipt of this value. A new asset of fundamentally different character is created. As between the settlement of a personal injury right of action and that of a claim for workers' compensation benefits, the transition and the result are almost indistinguishable.

The holdings of *Dulas* and *Sunde,* then, proffer a rule of decision for the dispute at bar. And, perhaps the most powerful indication that the Eighth Circuit and the Minnesota state courts would extend the *Dulas* analysis to Minn.Stat. § 176.175, Subd. 2, is *Dulas's* rejection of the "policy considerations" of bankruptcy's "fresh start" and the exemption statutes' ameliorative function. The Eighth Circuit expressly found that the textualist approach made such considerations irrelevant: the statute's language simply did not go far enough to protect the debtor, and the discussion had to end there. 95 F.3d at 705. The Minnesota Court of Appeals did not even consider the applicability of public policy in its analysis; it just saw the same "plain meaning" approach as driving the result. 2000 WL 1051938, *2.

 Thus, as cogent as the policy-based discussion of *Gagne* is, there is no indication that either the Eighth Circuit or the Minnesota appellate courts would adopt it now. The drive of *Dulas* and *Sunde* is just that strong. These signals come from

one court that has the direct authority to establish precedent binding on this one, and from a separate jurisdiction's court that has the preemptive authority to construe the legislation of its own forum. In the last instance, deference to their rulings is more compelled than is deference to *Gagne*. Exercising that deference requires the rejection of the Debtor's *Gagne*-based argument. Minn.Stat. § 176.175, Subd. 2, does not give the Debtor an exemption for the monies in her Oppenheimer Funds account.

*3. Whether subsequent legislative amendment extended the statutory exemption to the proceeds of a settlement.*

In the alternative, the Debtor argues that a 1999 enactment by the Minnesota legislature broadened the exemption of Minn.Stat. § 176.175, Subd. 2, enough to protect her. Before that amendment, Subd. 2 read:

> No claim for compensation owned by an injured employee or dependents is assignable. Except as otherwise provided in this chapter, any claim for compensation owned by an injured employee or dependents is exempt from seizure or sale for the payment of any debt or liability.

Minn.Stat. § 176.175, Subd. 2 (1998). The effect of the amendment was to add the words "or settlement of a claim for compensation" to the subdivision's first sentence, resulting in the language quoted *supra* at p. 474. 1999 Minn. Laws Ch. 212, § 1. The Debtor's counsel argues at great length that this extended the protection of an exemption to the proceeds of the settlement of a workers' compensation claim, wherever and in whatever form they may be held.

This argument is misplaced, literally; it goes to the wrong part of the statute. Subd. 2 has two operative components, in two different sentences. The first governs the assignment of an employee's rights under the Workers' Compensation program. In the wake of the 1999 amendment, it bars the assignment of either a claim for workers' compensation—i.e., the unfixed, unliquidated right to demand benefits, as it stands before settlement or a determination-or "the settlement of a claim" for benefits. The referent language added by the amendment is imprecise, but it is charitably construed as denoting an actual, in-hand realization of money from the settlement of a workers' compensation claim.

■ Assignment, however, is a voluntary process, in this context effected by the holder of an intangible right of recovery in favor of an assignee. *Travelers Indem. Co. v. Vaccari*, 310 Minn. 97, 100, 245 N.W.2d 844, 846 (1976). *See also United States v. Young*, 972 F.2d 355, 1992 WL 202469 at *2 (8th Cir.1992) (table); *In re Pritchard*, 75 B.R. 877, 879 (Bankr. D.Minn.1987). As a concept and process, assignment is distinct from involuntary attachment under collection process, such as levy or garnishment. An exemption under law protects an asset from the latter, which is a non-consensual seizure by a judgment creditor. *In re Pritchard*, 75 B.R. at 878–879.

■ The second sentence of Subd. 2 governs the exemption of a client's rights under the Workers' Compensation program. The 1999 amendment did not affect its previous language, which covered only "any claim for compensation." On its very face, then, the amendment has no bearing on the dispute at bar.[4]

---

4. The Debtor's counsel insisted on augment-

ing the record with a tape of the deliberations

## CONCLUSION

Minn.Stat. § 176.175, Subd. 2, does not provide an exemption for this asset, in the form in which the Debtor held it when she filed for bankruptcy, regardless of its source nearly a decade ago. The Trustee's objection must be sustained. The Debtor's rights in her Oppenheimer Funds account will be subject to administration for distribution to her creditors.

This result is neither easy, nor particularly savory. However, under the current state of legal authority, a court has no business construing the relevant statute in the way the Debtor urges.

## ORDER

IT IS THEREFORE ORDERED AND DETERMINED:

1. The Trustee's objection to the Debtor's claim of exemption in her Oppenheimer Funds account is sustained.

2. The asset described in Term 1 and in the Debtor's schedules will remain property of the bankruptcy estate and will be subject to administration for distribution to the Debtor's creditors.

on the 1999 amendments that were conducted by a committee of the Minnesota legislature. Counsel also salted their brief with quotations from various persons who had addressed the committee. Setting aside the fact that the amendment itself did not affect the relevant statute, this exercise was a wasted effort. For one, the utter clarity of the statute on its face would make resort to any legislative history unwarranted. *Davis v. Michigan Dept. of the Treasury,* 489 U.S. 803, 808 n. 3, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *Northern States Power Co. v. United States,* 73 F.3d 764, 766 (8th Cir.1996); *United States v. Field,* 62 F.3d 246, 249 (8th Cir.1995); *Arkansas AFL–CIO v. F.C.C.,* 11 F.3d 1430, 1440 (8th Cir. 1993); *State v. McKown,* 475 N.W.2d 63, 66–67 (Minn.1991). In any event, the remarks quoted in the brief contained no reference to the second sentence of Subd. 2, or to the specific protective function of an exemption statute. They only touched on the phenomenon of assignment, the subject of the first sentence, in that respect perfectly mirroring the post-amendment text.